DICKINSON, Justice,
 

 for the Court.
 

 ¶ 1. A married couple adopted twins born out of wedlock to J.G. and K.A.B.
 
 [1]
 
 J.G., who was unaware of the adoption, filed suit to set it aside. The chancellor set aside the adoption and awarded the twins to J.G. We are unable to find that the chancellor abused her discretion, and we affirm.
 

 BACKGROUND FACTS AND PROCEEDINGS
 

 ¶ 2. On July 3, 2006, K.A.B., a Caucasian female, learned from her doctor that she was pregnant with twins. During the period she could have conceived, she had approximately ten different sexual partners of various races, including J.G., an African-American. K.A.B. believed (during most of her pregnancy) that the father of her twins was her long-term boyfriend, who is a white male.
 

 ¶ 3. K.A.B. testified that she had informed J.G. — who was at her home the morning of her doctor’s appointment — that she had taken a home pregnancy test, and that it was positive. K.A.B. initially informed J.G. her boyfriend was the father, which she believed because she had been in a more long-term and consistent sexual relationship with her boyfriend than she
 
 *1126
 
 had been in with J.G. Furthermore, she testified that she did not believe J.G. could be the father because he had told her he was “fixed” (had a vasectomy). J.G. testified that he believed K.A.B. when she told him that the boyfriend was the father of the children. However, J.G. admitted that “maybe a week” after K.A.B. had told him she was pregnant by her boyfriend, she told him that it was possible J.G. was the father instead of her boyfriend.
 

 ¶ 4. During K.A.B.’s pregnancy, her relationship with J.G. became tumultuous. She threatened to file phone harassment charges against him if he continued to call her. J.G. testified he did not visit K.A.B. at her home or at the hospital at the time of the children’s birth, because he believed K.A.B.’s parents would not be happy about her involvement with an African-American.
 

 ¶ 5. The twin children at issue here were born on January 17, 2007. J.G. testified he had no reason to think the twins were his children when they were born, and therefore made no effort to contact or assume responsibility for them until he learned from a coworker two or three weeks after the children were born that the children were biracial.
 

 ¶ 6. K.A.B. told J.G. on January 18, 2007, that her boyfriend could not be the twins’ father because they appeared to be biracial. She also notified J.G. of her decision to place the children for adoption on January 24, 2007. J.G. asked K.A.B. to test their DNA before she placed them for adoption. He told her that, if the twins were in fact his, he would “keep them.” She invited J.G. to come to her home to visit the twins that same day, but J.G. refused because he feared K.A.B.’s parents would not approve of his being there.
 

 ¶ 7. He further testified that, because of K.A.B.’s promiscuous reputation, he wanted to wait until the DNA test confirmed he was the twins’ father before he began supporting them. For
 
 the
 
 same reason, he testified he told some of his coworkers he was not the twins’ father.
 

 ¶8. K.A.B. testified she did not notify J.G. of the adoption process, and she did not give the adoption attorney J.G.’s name or contact information. Dr. K.B. and Dr. R.M., a married couple, took custody of the twins on January 28, 2007, four days after they came home from the hospital. On February 6, 2007, the adoption was approved.
 

 ¶ 9. On the eighth or ninth of February, 2007, J.G. had his sister prepare a letter to send to Dr. K.B. and Dr. R.M. The letter, which was postmarked February 21 and delivered February 22, stated, in part:
 

 I am the alleged father of [the twins] and have not relinquished my rights as their biological father and have no intentions of doing so.... I would like to resume custody of my children ... my inte[t]ions are not to be mean to you, (as I appreciate you both wanting the babies) I only want the opportunity to love and raise my own children.
 

 Dr. K.B. signed for the letter on February 22, 2007, and K.A.B. received a copy the same day.
 

 ¶ 10. As of April 2, 2007, the twins had not been turned over to J.G., so he hired an attorney to file a Petition for Filiation, Determination of Rights and to Reopen and Unseal Adoption Proceedings (If Necessary) in the Chancery Court of Sunflower County. He sought to set aside the adoption or have the matter set as a contested adoption.
 

 ¶ 11. On June 15, 2007, a paternity test conclusively identified J.G. as the biological father of the twins. At trial, J.G. testified that the first time he purchased anything for the twins was in October 2007, which was also the first time he had visita
 
 *1127
 
 tion with the children. J.G. further testified that he was willing to assume legal and physical care of the twins, was financially able to assume the financial responsibilities of raising them, and had a family support system in place to help nurture them. Because his work often took him out of tow on business, J.G. testified he and his family members would have to make a joint effort to care for the young children.
 

 ¶ 12. At the time of trial, J.G. had two other minor children who were born out of wedlock to different mothers. He was paying child support of $56.50 per week per child, and he was visiting them regularly. J.G. testified that if K.A.B. had wanted to keep the children, he would have been happy for her to do so, and he would have been willing to pay child support and would actively have been part of the twins’ lives.
 

 ¶ 13. After trial, the chancellor issued her Findings of Fact and Conclusions of Law, concluding that the controlling statutes were Mississippi Code Section 93-17-5 and 93-17-6. Relying on a Mississippi Court of Appeals case,
 
 In
 
 re
 
 B.N.N.,
 
 928 So.2d 197 (Miss.Ct.App.2006), the chancellor ordered the adoptions to be set aside on February 19, 2008, and ordered the twins placed in J.G.’s custody on February 22, 2008.
 

 ¶ 14. The chancellor noted that “when considering the best interest of the child in termination of parental right and adoption cases, the law creates the presumption that the best interest of the child will be served by remaining in the custody of his natural parents.” Furthermore, the chancellor considered the following facts pertinent in her decision to set the adoption aside: (1) the mother had had multiple sexual partners during the time period in which the twins were conceived; (2) the biological father had kept his relationship with the mother a secret, at the mother’s request; (3) the putative father had taken the affirmative actions of filing a petition to determine heirship and challenging the adoption, and he had contacted Dr. K.B. and Dr. R.M. by letter; (4) circumstances created by the mother and/or her agents had thwarted the efforts of the biological father to demonstrate a full parental commitment; and (5) paternity was unknown until paternity testing had occurred.
 

 ¶ 15. The chancellor did not consider J.G.’s lack of support after the twins’ birth as a negative factor because of the “complicated deterrents” which J.G. encountered: (1) He initially had no reason to believe he could be the father where K.A.B. initially had told him another man was the father and she had been sexually active with at least ten men at the time of conception; (2) K.A.B. repeatedly had instructed J.G. to keep their relationship a secret because of her parents’ negative view of interracial dating; and (3) K.A.B. repeatedly had threatened J.G. with phone harassment charges if he called her.
 

 ¶ 16. Dr. K.B. and Dr. R.M., aggrieved by the trial court’s decision, filed them notice of appeal on February 22, 2008, raising two issues: (1) whether the chancellor erred by failing to terminate the parental rights of J.G., and (2) whether the chancellor erred by failing to act in the best interests of the children.
 

 ANALYSIS
 

 ¶ 17. This Court “will not overturn a Chancellor’s findings of fact when supported by substantial evidence unless an erroneous legal standard is applied or is manifestly wrong.”
 
 Crafe v. Olds,
 
 556 So.2d 690, 692 (Miss.1990).
 

 ¶ 18. Dr. K.B. and Dr. R.M. first argue that the burden was on J.G. to prove he had taken affirmative action to prevent the
 
 *1128
 
 loss of his parental rights. They contend that a putative father must prove by clear and convincing evidence that he has provided financial support or will provide such support in order to prevent loss of his parental rights under Mississippi Code Sections 93-17-5 and 93-17-6. Miss.Code Ann. §§ 93-17-5, 93-17-6 (Rev.2004).
 

 ¶ 19. Dr. K.B. and Dr. R.M. further argue that the chancellor was manifestly wrong in failing to terminate J.G.’s parental rights because J.G. did not fulfill his parental responsibilities as required by the aforementioned statutes. They contend that the chancellor was incorrect in her assumption that J.G. was on notice of his duties as a father only after he was informed the twins were biracial. They argue that having sexual intercourse with K.A.B. put J.G. on notice that he possibly was the father of the twins and, and since J.G. did not support K.A.B. during her pregnancy, he did not meet the requirements of the statute.
 

 ¶ 20. Dr. K.B. and Dr. R.M. cite numerous cases and statutes from our sister states which place a heavy burden on men who father children out of wedlock to take affirmative and immediate steps toward the responsibilities of parenthood. They contend that Mississippi Code Section 93-17-6(4) does not limit a man’s responsibility to support his illegitimate children to cases in which he has notice or proof that he is, in fact, the children’s father. Miss. Code Ann. § 93-17-6(4) (Rev.2004).
 

 ¶ 21. The absence of such limitation, Dr. K.B. and Dr. R.M. argue, indicates that the Mississippi Legislature has placed a high burden on men who have had sexual intercourse with women who are not their wives, including the duty immediately to accept and shoulder the responsibilities of parenthood in order to preserve their parental rights with respect to any resulting children. Dr. K.B. and Dr. R.M. contend that the only proof of fatherhood required by the Mississippi statute is sexual intercourse with the pregnant woman during the period of conception.
 

 ¶ 22. They further contend that the statute allows for three exceptions to the requirement of immediate action: (1) having no financial means to support the children, (2) having no knowledge of the mother’s pregnancy (as distinguished from knowledge or proof that he is the father of the pregnancy), and (3) being thwarted in his attempts to support the children by the mother or her agents. Dr. K.B. and Dr. R.M. contend that J.G. does not meet the requirements for any of these exceptions.
 

 ¶ 23. Finally, they argue that the chancellor’s decision to place the children in J.G.’s care was clearly not in the children’s best interests. They further claim the children were damaged by removing them from the home of their adoptive parents, and that because J.G. plans to utilize an extended family support system to raise the children, and because J.G. has less financial means than the two physicians, the children’s best interest would be served by affirming the adoption. Finally, Dr. K.B. and Dr. R.M. argue that J.G.’s statements that he would be comfortable with K.A.B. raising the children, despite his knowledge of her reputation, evidences a lack of parental insight.
 

 ¶ 24. In response to these arguments, J.G. states that he has demonstrated a parental commitment to the children to the degree possible under the extraordinary circumstances of this case. Relying on
 
 In re B.N.N.
 
 and
 
 K.D.F. v. J.L.H.,
 
 933 So.2d 971 (Miss.2006), he argues that, because of K.A.B.’s promiscuity (particularly at the time of conception), her threats to file phone harassment charges against him, and his fear of a hostile encounter with her parents, his desire to establish paternity before supporting K.A.B. and the twins
 
 *1129
 
 was reasonable under the circumstances, as was his minimal contact with the twins after their birth.
 

 ¶ 25. He further contends that the Mississippi adoption statute, Mississippi Code Section 93-17-5, specifies that the father to a child born out of wedlock “shall not have a right to object to an adoption unless he has demonstrated within the period ending thirty (30) days after the birth of the child, a full commitment to the responsibilities of parenthood.” Miss. Code Ann. § 93-17-5(3) (Rev.2004). He argues that the adoptions were invalid because they were finalized fewer than thirty days after the children’s birth. This, he argues, served to terminate his parental rights prior to the thirty days allowed him by the statute to demonstrate parental commitment.
 

 ¶ 26. Finally, J.G. contends that it is in the twins’ best interest to be with them natural father. He states that, under the law, financial means of the prospective parents is not determinative as to what is in a child’s best interest. Furthermore, he contends his testimony at trial demonstrates parental commitment and, like many single parents, he will utilize an extended family support network to help care for the children. J.G. argues that “there is no measure of the importance of children to know, be raised by, and share a close bond with them natural parents and them immediate and extended relatives.” He points out that the twins have been under his care for approximately one year, that they are doing well and they have bonded with him and his family, and that disruption of them family life would cause the twins great trauma.
 

 ¶ 27. Sections 93-17-5 and 93-17-6 of the Mississippi Code provide, in relevant part:
 

 (1) There shall be made parties to the proceeding by process or by the filing therein of a consent to the adoption proposed in the petition, which consent shall be duly sworn to or acknowledged and executed only by the following persons, but not before seventy-two (72) hours after the birth of said child: (a) the parents, or parent, if only one (1) parent, though either be under age of twenty-one (21) years....
 

 [[Image here]]
 

 (3) In the case of a child born out of wedlock, the father shall not have a right to object to an adoption unless he has demonstrated, within the period ending thirty (30) days after the birth of the child, a full commitment to the responsibilities of parenthood. Determination of the rights of the father of a child born out of wedlock may be made in proceedings pursuant to a petition for determination of rights as provided in Section 93-17-6.
 

 Miss.Code Ann. § 93-17-5 (Rev.2004).
 

 (1) Any person who would be a necessary party to an adoption proceeding under this chapter and any person alleged or claiming to be the father of a child born out of wedlock who is proposed for adoption or who has been determined to be such by any administrative or judicial procedure (the “alleged father”) may file a petition for determination of rights as a preliminary pleading to a petition for adoption in any court which would have jurisdiction and venue of an adoption proceeding. A petition for determination of rights may be filed at any time after the period ending thirty (30) days after the birth of the child....
 

 
 *1130
 
 (3) The sole matter for determination under a petition for determination of rights is whether the alleged father has a right to object to an adoption as set out in Section 93-17-5(3).
 

 (4) Proof of an alleged father’s full commitment to the responsibilities of parenthood would be shown by proof that, in accordance with his means and knowledge of the mother’s pregnancy or the child’s birth, that he either:
 

 (a) Provided financial support, including, but not limited to, the payment of consistent support to the mother during her pregnancy, contributions to the payment of the medical expenses of pregnancy and birth, and contributions of consistent support of the child after birth; that he frequently and consistently visited the child after birth; and that he is now willing and able to assume legal and physical care of the child; or
 

 (b) Was willing to provide such support and to visit the child and that he made reasonable attempts to manifest such a parental commitment, but was thwarted in his efforts by the mother or her agents, and that he is now willing and able to assume legal and physical care of the child.
 

 (5) If the court determines that the alleged father has not met his full responsibilities of parenthood, it shall enter an order terminating his parental rights and he shall have no right to object to an adoption under Section 93-17-7.
 

 [[Image here]]
 

 Miss.Code Ann. § 93-17-6 (Rev.2004).
 

 ¶ 28. The trial court relied on
 
 In re B.N.N.,
 
 928 So.2d 197 (Miss.Ct.App.2006), a case in which the mother of the child in question was deceased and the father of the child was a married man who had been having an extramarital affair with the mother. Because of their circumstances, the couple agreed to keep their relationship a secret and agreed to allow the mother’s husband to raise the child as his own. However, upon the mother’s death, the maternal aunt and uncle adopted the child. The father filed a petition to establish paternity and contested the adoption.
 

 ¶ 29. The trial court in
 
 In re B.N.N.
 
 found that the father’s efforts to prove paternity and secure custody of the child sufficiently evidenced his willingness to assume full parental responsibility. Furthermore, the chancellor found that the agreement to keep the relationship secret at the mother’s request excused the father from supporting her during the pregnancy and supporting the child after birth. In fact, the father tried to purchase gifts for the child, which the mother refused. The Court of Appeals found no error in the chancellor’s ruling and affirmed his decision.
 

 ¶ 30. The chancellor in the present matter did not abuse her discretion or commit manifest error in relying on this case. The factual circumstances are similar in that the parents were attempting to keep their relationship secret. Furthermore, the father in
 
 In re B.N.N.
 
 took substantial steps through the legal process to establish paternity and obtain custody of the child. The same can be said of J.G., who presented evidence that, within thirty days of the children’s birth, he was fully committed to parenthood and therefore had standing to object to the adoption pursuant to Section 93-17-5(3).
 

 ¶ 31. Furthermore, the chancellor reasoned that, based on the facts and circumstances, J.G. was reasonable in his fear of confrontation with K.A.B.’s parents. He also was reasonable in his limited contact with K.A.B. due to her threats to file
 
 *1131
 
 harassment charges against him. Accordingly, the chancellor found that J.G. had been thwarted by the mother and her agents from financially supporting and visiting the twins, and that he was willing and able to assume legal and physical care of the children, as provided by Section 93-17-6(4)(b).
 

 ¶ 32. Finally, in an Order of Clarification, the trial court stated:
 

 No evidence has been presented which would cause the Court to find [J.G.] unfit, or terminat[e] his parental rights. Therefore, the Court fails to see how [Dr. R.M. and Dr. K.B.] could prevail if the matter is heard as a contested adoption. Thus, the Court foresees the children being awarded to [J.G.] in any event. The longer the exchange of custody is put off, the more difficult it will be for all concerned.
 

 ¶ 33. Mississippi Code Section 93-17-7(2) allows for an adoption over the objection of a parent where: the parent has abused the child; the parent has not provided reasonably necessary food, clothing, shelter and treatment for the child; the parent suffers from a medical or emotional illness, mental deficiency, behavior or conduct disorder, severe physical disability, substance abuse or chemical dependency; viewed in its entirety, the parent’s past or present conduct would pose a risk of substantial physical, mental or emotional harm to the child; or the parent’s rights would be terminated under Miss.Code Ann. § 93-15-103. Miss.Code Ann. § 93-17-7-7(2) (Rev.2004).
 

 ¶ 34. Section 93-15-103(3) provides, in relevant part, the following as criteria for involuntary termination of parental rights:
 

 (a)A parent has deserted without means of identification or abandoned a child as defined in Section 97-5-1, or
 

 (b) A parent has made no contact with a child under the age of three (3) for six (6) months or a child three (3) years of age or older for a period of one (1) year; or
 

 (c) A parent has been responsible for a series of abusive incidents concerning one or more children; or....
 

 [[Image here]]
 

 (e) The parent exhibits ongoing behavior which would make it impossible to return the child to the parent’s care and custody:
 

 (i) Because the parent has a diagnosable condition unlikely to change within a reasonable time such as alcohol or drug addiction, severe mental deficiencies or mental illness, or extreme physical incapacitation, which condition makes the parent unable to assume minimally, acceptable care of the child; or....
 

 [[Image here]]
 

 (f) When there is an extreme and deep-seated antipathy by the child toward the parent or when there is some other substantial erosion of the relationship between the parent and child which was caused at least in part by the parent’s serious neglect, abuse, prolonged and unreasonable absence, unreasonable failure to visit or communicate, or prolonged imprisonment; or
 

 [[Image here]]
 

 (g) When a parent has been convicted of any of the following offenses against any child:
 

 (i) rape of a child under the provisions of Section 97-3-65,
 

 (ii) sexual battery of a child under the provisions of Section 97-3-95(c),
 

 
 *1132
 
 (iii) touching a child for lustful purposes under the provisions of Section 97-5-23,
 

 (iv) exploitation of a child under the provisions of Section 97-5-31,
 

 (v) felonious abuse or battery of a child under the provisions of Section 97-5-39(2),
 

 (vi) carnal knowledge of a step or adopted child or a child of a coha-bitating partner under the provisions of Section 97-5-41, or
 

 (vii) murder of another child of such parent, voluntary manslaughter of another child of such parent, aided or abetted, attempted, conspired or solicited to commit such murder or voluntary manslaughter, or a felony assault that results in the serious bodily injury to the surviving child or another child of such parent; or
 

 (h) The child has been adjudicated to have been abused or neglected and custody has been transferred from the child’s parent(s) for placement pursuant to Section 43-15-13, and a court of competent jurisdiction has determined that reunification shall not be in the child’s best interest.
 

 Miss.Code Ann. § 93-15-103(3) (Rev.2004).
 

 ¶ 35. We are unable to say that the chancellor committed manifest error in her findings, including that Dr. K.B. and Dr. R.M. failed to present facts meeting the statutory requirements for termination of J.G.’s parental rights. Therefore, we must affirm the chancellor’s decision to set aside the adoptions, and return the twins to the custody and care of their natural father.
 

 CONCLUSION
 

 ¶ 36. The chancellor did not commit reversible error in setting aside the adoptions and returning custody of the minor twins to their natural father, J.G. The trial court’s ruling is therefore affirmed.
 

 ¶ 37. AFFIRMED.
 

 WALLER, C.J., CARLSON AND GRAVES, P.JJ., RANDOLPH, LAMAR, KITCHENS, CHANDLER AND PIERCE, JJ., CONCUR.
 

 [1]
 

 . Because this is an adoption matter, the identities of the parties are being protected.